IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

v.                                  CRIMINAL ACTION NO. 2:17-cr-00062-2

CARL CLARK,

          Defendant.

MEMORANDUM OPINION AND ORDER

Pending before the court is Defendant Carl Clark's pro se Motion for Compassionate Release, [ECF No. 394]. The court in deciding such motions will consider the following: whether the defendant has exhausted his administrative remedies, has demonstrated "extraordinary and compelling reasons," is not a danger to the safety of others, and the § 3553(a) factors. In deciding what constitutes "extraordinary and compelling reasons" for release by reason of COVID-19, the defendant must demonstrate that he has a medical condition listed by the Centers for Disease Control and Prevention as causing an increased risk of severe illness from COVID-19 and that he is at a facility which cannot effectively prevent the spread of the virus. For the reasons that follow, the Motion is **DENIED**.

I.    Background

On April 23, 2018, Defendant was convicted of distribution of a quantity of methamphetamine under 21 U.S.C. § 841(a)(1). [ECF No. 133]. I sentenced him to

135 months of imprisonment. [ECF No. 256]. According to the Bureau of Prisons ("BOP"), Defendant's projected release date is December 8, 2026. *Find an Inmate*, Fed. Bureau of Prisons, https://www.bop.gov/inmateloc/index.jsp (last visited August 13, 2020). He is currently imprisoned at the minimum security satellite camp at Federal Correctional Institution Ashland ("FCI Ashland"), in Kentucky.

FCI Ashland is a low security institution with an adjacent minimum security satellite camp. FCI Ashland houses a total of 1,097 inmates (128 at the camp and 969 at the correctional institution). *FCI Ashland*, Fed. Bureau of Prisons, https://www.bop.gov/locations/institutions/ash/ (last visited August 12, 2020). According to the Bureau of Prisons ("BOP"), FCI Ashland has only had one staff member test positive for COVID-19. *See COVID-19 Cases*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus (last visited August 12, 2020). That staff member has since recovered. *Id.* In addition, FCI Ashland has one inmate who is currently positive for COVID-19, *see id.*, though it has had three positive inmate tests, *see COVID-19 Inmate Test Information*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus (last visited August 12, 2020).[1] Only 118 inmates at FCI Ashland have been tested for COVID-19. *See COVID-19 Inmate Test*

---

[1] The BOP website clarifies that "the number of positive tests at a facility is not equal to the number of cases, as one person may be tested more than once." COVID-19 Inmate Test Information, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus (last visited August 12, 2020).

*Information*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus (last visited August 12, 2020).

On June 3, 2020 and June 4, 2020, Mr. Clark filed two motions for compassionate release, [ECF Nos. 385, 387], requesting a reduction in sentence because of the threat posed by the COVID-19 pandemic, in combination with his health issues and the conditions of prison. I denied those previous motions for compassionate release, [ECF Nos. 385, 387], in part because Mr. Clark provided no medical records or other evidence upon which to assess his alleged health conditions. *See* [ECF No. 390]. He now moves under 18 U.S.C. § 3582(c)(1)(A) for a sentence reduction based on the same reasons outlined in his original motions; however, he provides his medical records for the court's consideration. [ECF No. 394].

## II. Discussion

The First Step Act "embodies Congress's intent to reduce [ ] [BOP's] authority over compassionate release petitions and authorizes the district courts to exercise their independent discretion to determine whether there are 'extraordinary and compelling reasons' to reduce a sentence." *United States v. Galloway*, No. CR RDB-10-0775, 2020 WL 2571172, at *3 (D. Md. May 21, 2020) (internal citations removed); *see also United States v. Stephenson*, No. 3:05-CR-00511, 2020 WL 2566760, at *5 (S.D. Iowa May 21, 2020) ("Unqualified deference to the BOP no longer makes sense now that the First Step Act has reduced the BOP's role.").

For me to reduce Mr. Clark's sentence under compassionate release, I must find that Mr. Clark has exhausted his administrative remedies, has demonstrated

"extraordinary and compelling reasons," is not a danger to the safety of others, and find that his release is consistent with § 3553(a) factors. *See e.g., United States v. Howard*, No. 4:15-CR-00018-BR, 2020 WL 2200855, at *2 (E.D.N.C. May 6, 2020); U.S.S.G. § 1B1.13 (2018). He has not satisfied all of those requirements, and I do not reduce his sentence today.

### (a) Exhaustion

Section 3582(c)(1)(A) provides that:
> … the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or* the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, *whichever is earlier*, may reduce the term of imprisonment…

18 U.S.C. 3582(c)(1)(A) (emphasis added). Prior to the enactment of the First Step Act, only the Director of BOP could file a motion for compassionate release. The First Step Act amended this provision to permit an inmate to file a motion in federal court seeking compassionate release, provided certain circumstances were satisfied. Put plainly, the court may modify a term of imprisonment upon the earliest of one of three events:

1. When the Director of BOP has made a motion;
2. When the defendant has exhausted his or her administrative remedies with BOP and petitioned the court;
3. When 30 days have lapsed from the date of the request to BOP and defendant has petitioned the court.

*Id.*

The language of the statute is clear. There are two ways for a defendant to petition the court for compassionate release. Those two options are alternatives. With the first option, the defendant must fully complete BOP's administrative appeals process. With the second option, "the statute's plain text states only that thirty days must past after the defendant requests compassionate release from the warden. No more, no less." *United States v. Carter*, ---F. Supp.3d----, ---, No. 2:19-CR-00078, 2020 WL 3458598, at *2 (S.D.W. Va. June 25, 2020).

In this case, I **FIND** that Mr. Clark has met the necessary criteria outlined in § 3582(c)(1)(A) to petition this court for compassionate release. Mr. Clark requested compassionate release from the Warden of FCI Ashland on April 6, 2020. The Warden responded, denying his request on May 22, 2020. [ECF No. 387–2]. Mr. Clark filed the instant Motion on July 22, 2020. [ECF No. 394]. Because 30 days had elapsed since the Warden's receipt of Mr. Clark's request, I find that he may petition the court for compassionate release pursuant to the statute.

### (b) Extraordinary and compelling reasons for release

Once an inmate has satisfied administrative exhaustion, a court may reduce his sentence upon a finding of "extraordinary and compelling reasons." *See* 18 U.S.C. § 3582(c)(1)(A).

There are "disagreements [among district courts] about the precise definition

of 'extraordinary and compelling reasons' justifying compassionate release."[2] *United States v. Cotinola*, No. 13-CR-03890-MV, 2020 WL 2526717, at *3 (D.N.M. May 18, 2020). But many courts, including this court, have found "'extraordinary and compelling' reasons 'supporting release on the basis of a combination of dire prison conditions and underlying health conditions that increase the likelihood of severe illness from COVID-19.'"[3] *United States v. White*, No. 2:17-CR-00198-4, 2020 WL 3244122, at *3 (S.D.W. Va. June 12, 2020) (citing *United States v. Bass*, No. 1:10-CR-166 (LEK), 2020 WL 2831851, at *7 (N.D.N.Y. May 27, 2020)); *see also United States v. Sawicz*, No. 08-CR-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020) (finding an "extraordinary and compelling reason" on the basis of the inmate's hypertension and conditions at FCI Danbury); *United States v. Foreman*, No. 19-CR-

---

[2] The specific extraordinary and compelling reasons listed in the Sentencing Guidelines for BOP to consider include i) the defendant is suffering from a terminal or serious medical condition; ii) age of defendant; iii) family circumstances of defendant; and iv) "other reasons." U.S.S.G. § 1B1.13; *United States v. Bass*, No. 1:10-CR-166 (LEK), 2020 WL 2831851, at *3–4 (N.D.N.Y. May 27, 2020). "Following the passage of the First Step Act, courts may independently determine whether such 'other reasons' are present in a given case, without deference to the determination made by BOP." *United States of America v. Thaher,* No. 17 CR. 302-3 (KPF), 2020 WL 3051334, at *4 (S.D.N.Y. June 8, 2020).

[3] "Section 1B1.13 of the United States Sentencing Guidelines contains the only policy statement issued by the Sentencing Commission pertaining to compassionate release," which has not been updated since the passage of the First Step Act. *See Bass*, 2020 WL 2831851, at *3; U.S.S.G. § 1B1.13.3 Thus, courts have taken this to mean that "there does not currently exist, for purposes of satisfying the First Step Act's 'consistency' requirement, an 'applicable policy statement.'" *See e.g., United States v. Redd*, 2020 WL 1248493, at *6 (E.D. Va. Mar. 16, 2020); *United States v. Brant*, No. 218CR20155TGBMKM1, 2020 WL 2850034, at *4 (E.D. Mich. June 2, 2020); *United States v. Brooks*, No. 07-CR-20047-JES-DGB, 2020 WL 2509107, at *3 (C.D. Ill. May 15, 2020).

62, 2020 WL 2315908, at *2–4 (D. Conn. May 11, 2020) (finding an "extraordinary and compelling reason" on the basis of the inmate's hypertension and age of 58, in combination with conditions at FCI Danbury); *United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *2, 9 (S.D.N.Y. Apr. 20, 2020) (finding an "extraordinary and compelling reason" on the basis of the inmate's hypertension, age of 55, and conditions at FCI Butner, which had 60 infected inmates); *United States v. Soto*, No. 18-CR-10086, 2020 WL 2104787, at *2 (D. Mass. May 1, 2020) (finding an "extraordinary and compelling reason" on the basis of the inmate's hypertension and the presence of 27 reported inmate cases in his facility); *see also Groups at Higher Risk for Severe Illness*, Ctrs. for Disease Control & Prevention (May 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-athigher risk.html). I previously granted compassionate release to a defendant who was immunocompromised—suffering from a liver disease, Hepatitis C. *See White*, 2020 WL 3244122, at *6; s*ee also Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited August 12, 2020) (listing "immunocompromised state" as an underlying medical condition causing an "increased risk for severe illness from COVID-19").

I recently held in *United States v. John Delaney Wilson*, ---F. Supp.3d----, ---, No. 2:18-cr-00295, 2020 WL 4287592 at *2 (S.D.W. Va. July 27, 2020), that I should not find "extraordinary and compelling" reasons exist to grant release because of COVID-19 unless the inmate has a condition that makes him or her more at risk for

7

developing a serious illness from COVID-19 and the facility where the inmate is housed has conditions such that its inmates are at a high risk of contracting COVID-19. In deciding which conditions result in an inmate being a higher risk for COVID-19, I will defer to CDC's list of medical conditions causing an increased risk of severe illness from COVID-19. *See Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited August 13, 2020). Using CDC guidance will allow for more predictable standards in deciding which defendants have "extraordinary and compelling" reasons justifying release.

In *Wilson*, I also emphasized that if an inmate can demonstrate that he or she has a condition identified by CDC, next, the defendant must show that his or her prison conditions are such that BOP cannot effectively prevent the spread of COVID-19. Factors include but are not limited to the steps BOP has taken to stop the spread of COVID-19 in that particular prison and steps to follow CDC guidance, the ability of inmates to socially distance, the amount of hygiene products and face masks provided to inmates, and the number of COVID-19 cases in that prison.

Here, Mr. Clark has presented sufficient evidence that he has a condition that makes him at risk for developing serious illness from COVID-19. Mr. Clark's medical records indicate that he suffers from obesity and that his hemoglobin A1C levels are high, indicating that he is prediabetic. *Medical Records*, Ex. 1 [ECF No. 394–1]. The CDC lists obesity and type 2 diabetes mellitus as underlying medical conditions that presents an increased risk for a person at any age developing a severe illness from

COVID-19. *See Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited August 13, 2020). The CDC lists type 1 diabetes mellitus as an underlying medical condition that might present an increased risk for developing severe illness from COVID-19. *Id.* Mr. Clark's medical records indicate that he is at an increased risk for developing diabetes due to his high hemoglobin levels. *Medical Records*, Ex. 1 [ECF No. 394–1] (reporting Mr. Clark's hemoglobin A1C as 6.1, which is diagnosed as in the "increased risk" range for diabetes). He, however, has not been diagnosed with type 1 or 2 diabetes. Being prediabetic is not listed by the CDC as a condition that presents a heightened risk for developing severe illness from COVID-19. Mr. Clark's diagnosis as obese, though, convinces me that he is at risk for developing severe illness from COVID-19.

Despite presenting sufficient evidence that he suffers from medical conditions identified by CDC as placing him at a risk for severe illness from the virus, Mr. Clark has not demonstrated that he is housed at a facility with a high risk for contracting COVID-19. Factors to be considered at this stage of the inquiry include, but are not limited to, the steps BOP has taken to stop the spread of COVID-19 in the particular prison and steps to follow CDC guidance, the ability of inmates to socially distance, the amount of hygiene products and face masks provided to inmates, and the number of COVID-19 cases in that prison.

Mr. Clark is currently imprisoned at the camp located at FCI Ashland. As previously mentioned, I denied Mr. Clark's prior motions for compassionate release.

9

[ECF No. 390]. The situation at FCI Ashland has not substantially changed since I considered those motions. According to BOP, FCI Ashland currently has one inmate and one staff member who have tested positive for COVID-19, though the staff member has since recovered. *COVID-19 Cases*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus (last visited August 12, 2020). While the number of positive COVID-19 tests in a facility is not dispositive of BOP's ability to prevent the spread of the virus, I recently held that "a high number of positive cases is a clear indication that a person housed at a facility is at high risk. Absent that showing, it is difficult to evaluate the particularized threat of the virus to a defendant." *United States v. Gorman*, No. 2:29-cr-00131, 2020 WL 4342218 at *3 (S.D.W. Va. July 28, 2020). The BOP, however, should not take this as an invitation to conduct minimal testing for COVID-19 among inmate populations. Like in *Gorman*, I am concerned that the reported positive tests at FCI Ashland do not accurately reflect the actual number of cases in the facility.

BOP reports that only 118 of the 1,097 inmates have been tested.[4] *COVID-19 Inmate Test Information*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus (last visited August 12, 2020). Without more thorough testing within BOP facilities,

---

[4] FCI Ashland houses a total of 1,097 inmates. BOP reports that 128 inmates are housed at the adjacent camp and 969 inmates are housed at the FCI. FCI Ashland, Fed. Bureau of Prisons, https://www.bop.gov/locations/institutions/mil/ (last visited August 12, 2020). It is not clear to the court whether the reported 118 tests that were administered to inmates at FCI Ashland includes the inmates housed at the camp. BOP does not report any separate numbers about COVID-19 testing at the Ashland camp.

I am left to wonder whether the present risk to Mr. Clark and other inmates is in fact much greater than is reported. I will not, however, find that a facility presents a high risk simply based on speculation. While any number of COVID-19 cases within the prison context is great cause for concern, simply a generalized assertion of the existence of the pandemic alone should not independently justify compassionate release. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). That BOP reports only two total confirmed cases of COVID-19 within FCI Ashland indicates that there is no reason to believe the conditions at the facility are such that BOP cannot effectively prevent the spread of COVID-19.

I recently discussed the reported steps FCI Ashland has taken to prevent the spread of COVID-19 in *United States v. Jeremiah Joe Jonson*, No. 2:17-CR-00109, 2020 WL 4679416 (S.D.W. Va. Aug. 12, 2020). Specifically, in *Johnson*, the government reported that FCI Ashland is taking the following measures:

- Temperature checks on inmates are performed at least weekly. Every inmate is also temperature checked before going to work, commissary, or recreation.

- Inmates are to remain in their living quarters, and do not intermingle between units.

- Staff and inmates are provided with face coverings. Inmates are required to wear them at all times. Staff are required to wear them at all times, unless they are in a private setting with good social distancing (private office setting).

- Staff are screened daily, via temperature check and questionnaire.

- All inmates are tested for COVID-19 upon arrival and placed in quarantine for 14 days. They are then tested again for

11

COVID-19 prior to release to General Population. All inmates are again tested for COVID-19 prior to transfer or release. They are then quarantined for 14 days and tested for COVID-19 prior to leaving.

- Movement has been restricted nationwide, and FCI Ashland has received less than 100 inmates in the past 4 months. An empty Unit is setup for isolation at the FCI (HB) and the Camp (AA). The Quarantine Unit is empty at the camp (AB), and the Gymnasium and Visitation is set up with 50 cots for quarantine at the FCI. The education department is set up as a Recovery Area at the FCI, and the Visiting Room at the Camp for Recovery.

- Inmates are required to clean their areas, and then moved to the recreation yard, while the area is deep cleaned without interference. The unit is left empty for 1 and 1/2 hours after cleaning. This is done twice, weekly.

- The facility was recently approved to send 10 inmates at a time to the commissary to allow for good social distancing and allow extra time out of units.

- Unicor [an inmate work program] has been working for the past 6 weeks on a lightened crew. (about 60%). All Unicor inmates are in one unit, to separate them from the rest of the population.

- Staff are not allowed to visit other areas in the institution from that which they are assigned. A waiver has been approved for only 1 unit team member to make rounds for all units in the Special Housing Unit.

- Each department has a staff member assigned to each unit, not allowing for intermingling.

- Reminder emails are sent out weekly to staff and inmates to ensure proper hand sanitation, cell sanitation, and cleaning.

- A COVID-19 desktop icon has been set up with all information for staff and what has been sent to inmates.

- An "ASH/staff" questions mailbox was established to allow staff to send emails regarding COVID-19 response in a more private setting.

*Id.* Given the recency of my decision in *Johnson*, I find these reported steps to be relevant in this case.

These measures, taken together with the low number of confirmed cases of COVID-19, convince me that the conditions at FCI Ashland are not presently such that BOP cannot effectively prevent the spread of COVID-19 within the prison. Accordingly, I do not find extraordinary and compelling reasons justifying Mr. Carter's release and do not reduce his sentence. Therefore, I need not determine whether he is a danger to the community or consider the § 3553(a) factors.

### III. Conclusion

The court **DENIES** Mr. Clark's pro se Motion for Compassionate Release, [ECF No. 394]. The court **DIRECTS** the Clerk to seal Mr. Clark's medical records attached as Exhibit 1 to his pro se Motion due to the private and sensitive information contained therein. *See Medical Records*, Ex. 1 [ECF No. 394–1]. The court further **DIRECTS** the Clerk to send a copy of this Order to Defendant, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER: August 13, 2020

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

13